COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-05-379-CR

ROY ALVIN ADAMS APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 396TH DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM
 
OPINION
(footnote: 1)

------------

I.  Introduction

Appellant Roy Alvin Adams was charged with intoxication manslaughter with a deadly weapon.  After Adams pleaded not guilty, a jury found him guilty and assessed his punishment at 12 ½ years’ confinement. 

In his first two issues Adams claims the evidence is legally and factually insufficient to sustain the verdict.  In his next three issues Adams asserts that the trial court erred by failing to suppress the blood alcohol test, by denying his requested jury instruction under Article 38.23, and by overruling his objection that the prosecutor’s cross-examination was shifting the burden of proof.  In his sixth, seventh, and eighth issues Adams argues that the trial court improperly made a deadly weapon finding and erred by overruling his objection to retrograde extrapolation testimony and by not holding a hearing on his amended motion for a new trial.  In his final two issues Adams contends that the State violated his right to due process by failing to disclose exculpatory evidence and that the trial court erred by overruling his objection to the repeated playing of the videotape in violation of Texas Rule of Evidence 403.  We affirm. 

II.  Background

A. The Traffic Stop

It was June 12, 2004, when Officer Darren Medlin notified dispatch that he was making a traffic stop.  Officer Medlin stopped Angela Youngblood for speeding ninety-two miles per hour near Highway 121’s southbound Cheek-Sparger exit and parked safely behind her Mustang.  The patrol car’s rear deck lights were active.  Traffic was light and weather-wise, the night included intermittent sprinkling.

B. Omar Hinojosa 

While Officer Medlin worked the traffic stop, Omar Hinojosa, a truck driver, was driving home from work.  Having driven his eighteen-wheeler to Houston that day, he had dropped it off and was now in the middle of Highway 121 south.  Before reaching the Cheek-Sparger exit, Hinojosa noticed police lights ahead, off the shoulder, where someone had been pulled over.  Within seconds, Hinojosa also realized that a car was traveling in front of him in the far right lane.  Although they were still approximately a quarter to a half-mile away from the stopped cars, Hinojosa worried that the other car seemed too close to the officer’s vehicle.  Familiar with traffic laws, Hinojosa knew that cars approaching an emergency vehicle should either move away or slow down, but the other car did neither.  Hinojosa moved to the inside lane, yielding space to the other car to move away from the outside lane.  Hinojosa witnessed the car collide with the parked Mustang and saw no indication that the car causing the collision had braked beforehand.

Hinojosa called 911 and immediately stopped.  While trying to calm the woman who had been stopped by the officer, he noticed the officer lying in the road.  He had no contact with the driver of the vehicle that struck the Mustang. Hinojosa testified that the vehicle that struck the Mustang was not speeding or weaving.  He said it appeared that somehow the driver just lost control of the vehicle.  An unidentified passerby checked the officer for vital signs, apparently finding none.

C. Officer Darren Medlin

Officer Medlin, the victim in this case, had been serving the Grapevine Police Department since 2000 primarily as a DWI patrol officer; he was also tactical unit sniper.  He and his wife, Gina, lived near Grapevine and had two little girls.

Grapevine’s traffic division focuses on traffic enforcement, accident investigation and reconstruction, and DWI detection; in 2004, two officers held the nighttime positions.  One was Officer Mark Shimmick; the other was Officer Medlin.

On Friday, June 11, 2004, Officer Medlin spent the day testifying at a trial.  After leaving the Tarrant County courthouse in the afternoon, Officer Medlin went home to sleep and then began his shift at 11:00 that night.  He and Officer Shimmick met with their supervisor, then headed out on patrol.

D. Roy Adams

Adams lived with his mother in Bedford.  On Friday, Adams woke at 6:45 a.m. and went to work at 8:00.  He left work at 5:00 to wash his new car, then visited Sam’s Club to browse.  Adams went alone to a topless bar called the Dallas Gentlemen’s Club, arriving at 7:30 p.m.  Adams drank Crown Royal shots and claimed to have left the club at 11:30 p.m.  After a gas station stop, he went to another club.  However, Adams’s ATM receipts place him at the gas station at 1:00, suggesting that he remained at the topless bar longer than he claimed.  At the second club, Adams ordered another Crown Royal and left at 2:00 a.m.

Heading home on Highway 121, Adams sought the Cheek-Sparger exit.  Adams said that he was not feeling any adverse effects from alcohol or lack of sleep, but he admitted having some fatigue from dancing.  Adams said he saw the exit, but saw nothing more until he observed the deployed passenger-side air bag, broken windshield, and his car sliding to a stop down the exit ramp. When his car came to a stop, he got out and saw headlights behind him.  He looked at his car and then called 911.  Next, he called his mother.

Adams withdrew significant sums of cash on the day of the crash.  A lunchtime withdrawal netted $80.  Later at 8:35 p.m., he obtained $100 from the strip club’s ATM.  Two hours later, Adams withdrew $60 more from the same ATM.  Shortly before 1:00 a.m., Adams extracted another $60 while at a Race Trac gas station in north Dallas.  Adams had $45 with him after the crash, indicating he spent $255 cash during the day and night of the accident.

III.  Sufficiency of the Evidence

In his first two issues, Adams asserts that the evidence to sustain the verdict against him is both factually and legally insufficient.  We disagree.  

A.  Standards of Review

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Hampton v. State
, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789.  The trier of fact is the sole judge of the weight and credibility of the evidence.  
See
 Tex. Code Crim. Proc. Ann.
 art. 38.04 (Vernon 1979); 
Margraves v. State
, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact finder.  
Dewberry v. State
, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the evidence in favor of the verdict.  
Curry v. State
, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

The sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case.  
Malik v. State
, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); 
Ortiz v. State
, 993 S.W.2d 892, 895 (Tex. App.—Fort Worth 1999, no pet.).  Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State’s theories of liability, and adequately describes the particular offense for which the defendant was tried.  
Gollihar v. State
, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001); 
Malik, 
953 S.W.2d at 240.  The law as authorized by the indictment means the statutory elements of the charged offense as modified by the charging instrument.  
See Curry
, 30 S.W.3d at 404.

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party.  
Watson v. State
, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); 
Drichas v. State
, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005).  We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact-finder’s determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the fact-finder’s determination is manifestly unjust.  
Watson
, 204 S.W.3d at 414–15, 417 
; 
Johnson v. State
, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).  To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts
 the verdict.  
Watson
, 204 S.W.3d at 417
.

In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court “harbor a subjective level of reasonable doubt to overturn [the] conviction.”
 
 Id
.  We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury’s resolution of a conflict in the evidence.  
Id
.  We may not simply substitute our judgment for the fact-finder’s.  
Johnson
, 23 S.W.3d at 12; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  Unless the record clearly reveals that a different result is appropriate, we must defer to the jury’s determination of the weight to be given contradictory testimonial evidence because resolution of the conflict “often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered.”  
Johnson
, 23 S.W.3d at 8.  Thus, we must give due deference to the fact-finder’s determinations, “particularly those determinations concerning the weight and credibility of the evidence.”  
Id
. at 9.

An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant’s complaint on appeal.  
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).  Moreover, an opinion reversing and remanding on factual insufficiency grounds must detail all the evidence and clearly state why the finding in question is factually insufficient and under which ground.  
Goodman v. State
, 66 S.W.3d 283, 287 (Tex. Crim. App. 2001); 
Johnson
, 23 S.W.3d at 7.

B. The Evidence 

1. Post-crash Investigation

At 2:32 a.m., dispatch sent Euless Officer Deana Ramsour to investigate a possible major collision involving an officer on Highway 121.  She arrived as Officer Edgar Hurtado was trying to stop the traffic that still flowed through the scene.  Officer Hurtado advised Officer Ramsour that the suspect vehicle was further down the road and waved her south toward that area.  Adams’s 2004 Lincoln was 500 feet from the accident location and stopped in the center of the freeway exit.  Its lights were still on, and it had major damage to the right front quarter panel, right front tire, and windshield.  Embedded in the windshield were hair, blood, scalp debris, and a piece of Officer Medlin’s uniform. Inoperable, the car’s right front tire was back under the front passenger’s floorboard area.

Adams sat across the exit ramp on the road’s shoulder, talking on his cell phone.  When Officer Ramsour pulled up, Adams started to head across the roadway to her and stepped in front of traffic flowing through the area.  Officer Ramsour yelled for Adams to stop, a car passed, and, after checking for other traffic, she told Adams to come over to her.

Officer Ramsour first determined that the Lincoln was Adams’s and that he had been driving.  Adams quickly inquired, “Did I hit someone, did I hit someone?”  Apologizing, he surmised that he had run into a parked car.  Adams also explained that he must have dozed off, and he repeatedly asked whether he had hit someone.  Adams also indicated that he had been at a friend’s house.  As they spoke, Officer Ramsour noticed a very strong, distinct alcohol odor coming from Adams’s breath and body.  His eyes were very red, bloodshot, watery, dilated, heavy, and glassy, and his speech was slightly slurred.  Observing these signs of intoxication, Officer Ramsour asked a question about drinking.  Adams conceded that he had been drinking earlier and repeated his dozing off contention.  Officer Ramsour asked Adams to sit in her car for safety’s sake until the traffic could be stopped.  She specified that he was not under arrest, but that he was being detained so she could talk with him about what had happened.

Uncuffed, Adams willingly sat in the back of the vehicle.  When the officer left him in the car, the air was running “full blast” and she had opened the rear hatch to access traffic cones and flares.  While in the car, Adams started yelling and screaming; he said that he could not breathe.  Hearing his cries, Officer Ramsour returned to her car to find Adams breathing normally.  Officer Ramsour asked him to calm down so she could continue to secure the scene.  Meanwhile, Sergeant Williamson contacted Officer Ramsour by radio to assist her.  Officer Ramsour told the sergeant that Adams might be intoxicated, but she had not done any field sobriety tests yet.

Officer Ramsour identified the videotape from her police vehicle, which showed her arrival at the scene up to the point of making contact with Adams.  She said the in-car video automatically activates when the emergency lights are turned on.  However, her video shut off after she exited the vehicle.  Officer Ramsour explained that she hit the stop button prior to exiting the vehicle, which she always does when she responds to a major incident.  She said if it had been a DWI stop she would not have turned off the video.  Officer Ramsour said she knew that if she had left her video on the jury would be able to hear and see Adams as she initially approached him and engaged in the conversation she testified about.  She said turning the video off was not police policy, it is just something she does.

Sergeant Williamson drove down to the area near Adams’s car.  Officer Ramsour informed him of her observations and Adams’s statements.  The sergeant then took over the investigation of Adams.  Retrieving Adams from Officer Ramsour’s SUV, the sergeant noticed a moderate to strong smell of alcohol wafting from Adams.  Sergeant Williamson interviewed Adams, learning that, this time, Adams contended that he had merely consumed one or two drinks.  Adams refused to do any field sobriety tests.  Adams did not appear to be totally coherent, and he had bloodshot, glassy eyes.

Based upon the physical evidence and the discussions amongst the officers, Adams was arrested.  Sergeant Williamson believed that Adams’s intoxication had caused the death of Officer Medlin.  At the police station, the sergeant conducted a DWI interview, read Adams the appropriate warnings, obtained Adams’s blood-test refusal, and transported Adams to Harris Methodist HEB Hospital for a mandatory blood draw.  Sergeant Williamson observed the nurse draw the blood.  Williamson testified that he took Adams to the police department and put the blood sample into a secure refrigerator.

Tracy Langley, the nurse who drew the blood, testified that Adams was very afraid and kept repeating “oh my God.” She said she never smelled the odor of alcohol on Adams.  She could not tell if he was intoxicated.  She said if he was intoxicated she would remember that.

2. Accident Reconstruction

Back at the crime scene, Euless Detective Scott Peterson arrived.
(footnote: 2)  He walked through the area, first turning to Officer Medlin’s undamaged car.  He found the rear flashing lights on, the radio still working, a speed locked into the radar, and the in-car video camera recording.  Down the road past crash debris, the detective came upon the Mustang and observed obvious damage to the back left quarter panel area.  Next, the detective stepped over to the tarp that covered his fallen comrade’s body.  Later, he walked to where Adams’s vehicle had stopped.  The C.R.A.S.H. team arrived and began to photograph, collect, and analyze the evidence and also to forensically map the scene.  Officers reopened the freeway at about 8:45 a.m.

Officer Medlin wore his navy blue uniform, girded with body armor made of Kevlar.  The Kevlar did not protect him from the blunt force trauma he suffered.  Detective Peterson deduced that Adams’s vehicle struck Officer Medlin’s right side.  Without any braking, the Lincoln hurtled straight into Officer Medlin at highway speed.  The officer’s head hit the car’s steel roof structure above the windshield, wedging it back several inches.

The accident reconstruction efforts exposed no evidence of pre-impact braking.  After colliding with the officer and the Mustang, Adams’s Lincoln scraped its metal undercarriage and ground to a halt on the inverted front-wheel several hundred feet from the collision site.  Significantly, the detective concluded that the Lincoln could not have gone straight down the exit ramp—as it did—unless someone was steering.  In other words, if no one had steered, the damaged vehicle would not have slid straight down the ramp.
(footnote: 3) 

Detective Peterson reviewed all of the evidence collected, all of the videotapes from the police cars, all of the photos, and all of the radio traffic and 911 tapes from that night.  In light of that evidence, he concluded that Adams was intoxicated and that his intoxication caused the collision that killed Officer Medlin.  Detective Peterson further believed that Adams was reckless in controlling his vehicle, maintaining a proper lookout, and driving onto the shoulder of the road on the night he hit Officer Medlin.  Contributing factors included alcohol, fatigue, and failure to maintain a single lane.  But for Adams’s driving that night, he stated that Officer Medlin would still be alive.

3. Medical Examiner’s Evidence

Dr. Nizam Peerwani, the Tarrant County Medical Examiner, testified regarding the results of the autopsy performed on the body of Officer Medlin. Injuries to Officer Medlin’s skull and neck were capable of causing his death. Blunt force trauma to the right side of his head, behind the right ear, was the most significant injury.  This wound consisted of a deep, gaping laceration with an underlying depressed, compound skull fracture and massive brain trauma and resulted in the officer’s death.  This fatal injury was caused by motor vehicle contact and was consistent with the officer’s head colliding with the roof structure of the Lincoln, leaving the steel indented.  Officer Medlin suffered multiple skeletal fractures including the right arm bone, the compound fracture of his left leg, the right shin bone, and a compound fracture of the collar bone.  The two leg fractures occurred approximately nine inches above the heels and are typical of an upright pedestrian-vehicle collision.  Officer Medlin’s body also suffered multiple rib fractures that correlate to the major trauma his body suffered when it landed at an angle.  Dr. Peerwani concluded that the cause of Officer Medlin’s death was blunt force injuries due to a motor vehicle-pedestrian collision.  He concluded the official manner of death was homicide.
 4. Deadly Weapon Finding 

Officer Shimmick stated that a motor vehicle constitutes a deadly weapon.  Both Detective Peterson and Dr. Peerwani concurred with this characterization.

5. Adams’s Intoxication

a. Direct Evidence of Impairment

Evidence of Adams’s smell, appearance, and speech indicated intoxication.  Witnesses at the scene testified that a very strong and distinct odor of alcohol wafted from both his breath and his body.  They also testified that Adams’s eyes were very red, bloodshot, watery, dilated, heavy, and glassy.  His speech was slightly slurred.

Sergeant Williamson confirmed that on his video Adams said that he had drunk two to three hours earlier, not that he had drunk a lot earlier or had been drinking all day and that he had dozed off.  Officer Ramsour testified that going to a smoky night club can cause red, bloodshot, watery eyes, and that allergies also can cause this.  Sergeant Williamson also testified that bloodshot eyes can be caused by any number of things and that the odor of alcohol, by itself, is not a sign of intoxication.  He also said that being involved in an accident can cause someone to become disheveled and anguished.  

Besides his outward appearance suggesting intoxication, Adams admitted to Officer Ramsour he had been drinking “a whole lot earlier, but that he had stopped a couple of hours ago.”  
Adams later denied drinking on the night of the offense while being treated by another doctor a few weeks after the crash.  
Months after the offense, Adams told his neurologist that he drank four shots of alcohol between 7:00 p.m. and midnight, then one more shot between midnight and 2:00 a.m.

Furthermore, running into a parked car, stepping into traffic, and being unaware of whether you had hit someone can point to intoxication.  There was testimony that intoxicated drivers have trouble staying on the road and judging distances.  The Lincoln traveled 900 feet after impact.  Detective Peterson advised the jury than an unimpaired driver could have stopped more quickly. Also, Adams’s refusal to perform field sobriety tests when asked suggested that he was trying to hide his insobriety.  Adams also refused to perform tests on videotape and to submit to a blood test. 

b. Scientific/Expert Testimony Regarding Impairment

Proof of intoxication also came from Adams’s blood sample, which revealed his .11 blood alcohol concentration (BAC).  Two experts from the Tarrant County Medical Examiner’s (ME’s) office interpreted these results, informing the jury that a BAC of .11 impacts on a person’s reaction time and his or her ability to perceive things in front of him or her.  At that level, a person’s judgment is impaired.  However, someone with an alcohol tolerance could still appear sober to the casual observer, but be incapable of complicated tasks.  Moreover, a .11 BAC proves impairment for the purposes of driving, both under the per se statutory standard and because they would not have the normal use of their mental and physical faculties. 

Beryl Landry, a forensic toxicologist at the ME’s office, testified that she received a blood sample on June 14, 2004 that purported to come from Adams.  The sample was twice tested using gas chromatography and indicated a .1170 and .1188 BAC.  Landry admitted that the lab was not accredited in June 2004 when this test was performed.  She also admitted that there had been malfunctions with the gas chromatograph in the past.  Landry testified she had no idea what the BAC of Adams was on June 12
 at 2:30 a.m., the time of the accident.

Angela Springfield, chief toxicologist for the ME’s office, testified concerning her review of the testing records in this case.  She said the test was run in accordance with office protocol.  Springfield said the lab was accredited in June 2005 and was not required to be certified before then. 
 The ME’s office is now accredited and received the accreditation in June 2005 by the American Society of Crime Laboratory Directors/ Laboratory Accreditation Board (ASCLD/LAB).
(footnote: 4)  Prior to this accreditation, the lab was subjected to proficiency testing by the College of American Pathologists.  Landry testified that they were evaluated four times a year and there were no problems.  
Springfield also said that the proficiency testing results prior to certification were satisfactory.

Dr. Maurice Dennis, an expert on how alcohol affects a person’s ability to drive, concluded that complex reaction time is affected at a .05 BAC.  He supported this assertion by contending that, not only his research, but also that of the AMA and many others, shows that all individuals are intoxicated when their BAC reaches .05.  His own research revealed that each participant lost the normal use of their mental and physical faculties at a .04 BAC.  He further testified that alcohol impairs the ability to drive for several reasons.  Driving is a divided-attention activity, and driver vigilance is actually affected at a level of .025 BAC.  
People brake when they perceive the need, and, since alcohol impairs the ability to perceive, Adams’s failure to brake before the collision was consistent with his being intoxicated.  
Also, a prominent British study indicated that the likelihood of sleepiness increased at a .06 BAC. In general, Dr. Dennis explained that the higher the blood-alcohol level, the greater the risk of a fatal crash.  Dr. Dennis reviewed information regarding this crash and opined that both intoxication and drowsiness were contributing factors.

6. Videotape 

Grant Fredericks of Avid Technology testified that he enhanced the various police videos from the scene of the accident.  The videos were then played numerous times for the jury.  Fredericks testified that when a police officer comes to a scene where he thinks there may be evidence to obtain he should leave his recorder on.  He also said that at the time of impact Officer Medlin’s heel may have been touching the white line that separates the shoulder of the roadway from the rest of the road.

C. Adams’s Defense 

1. In General 

Adams ultimately relied on an epilepsy defense at trial.  The evidence at trial showed that the connection between alcohol and seizures is very complicated, and both alcohol consumption and alcohol withdrawal can induce seizures.

Some evidence revealed that Adams may have fallen asleep.  Adams specifically told Officer Ramsour that he must have dozed off while driving.  But since alcohol is a depressant and makes people sleepy, Adams’s admission that he dozed off also indicated that he was possibly intoxicated.  
However, when Adams testified, he claimed that alcohol did not make him sleepy.  Adams’s prescription for Zyrtec-D was in his car and warned of drowsiness when combined with alcohol.  
Dr. Dennis opined that alcohol tends to exacerbate sleepiness and that drinking enough alcohol can make you pass out.  Dr. Dennis agreed that Adams’s falling asleep could have caused this crash.

Some evidence did not directly support the State’s contention that Adams was either intoxicated or drowsy due to intoxication.  Adams had not been speeding or weaving and traveled at the posted speed limit.  Post-collision, Adams telephoned 911 and recited his phone number and location.  According to DWI Officer Shimmick, Adams’s speech during the call did not sound slurred.

Contrary to the State’s evidence of intoxication, at trial Adams discussed conditions such as nightclub smoke and allergies, which can cause eye irritation symptoms.  Other defense evidence described people being disoriented or uncooperative after experiencing a car wreck.

Adams also suggested that Officer Medlin stood in an unsafe place.  Officer Medlin’s fatigue from a long day in court, supposedly causing him to disregard safety procedures, was another defense proposition.  When Adams testified, however, he agreed that Officer Medlin bore no fault for this crash. 

2. The Epilepsy Defense

At twenty-seven, Adams had no medical history of seizures.  Weeks after the crash, Adams did have a seizure.  At trial, Adams contended that he did not remember the crash, did not fall asleep, and must have suffered a seizure.

Jurors learned of two generalized tonic-clonic (GTC) seizures.  On June 29, 2004, Adams sought an allergy treatment and, while in the waiting room, suffered a GTC seizure after just having filled out a form that indicated no seizure history.  Adams convulsed, became rigid, and lost consciousness; paramedics were called.  Kay Alexander, a nurse, and Sally Hernandez, a medical assistant at the ear, nose, and throat clinic in Bedford, both testified that they observed Adams have a seizure and lose consciousness.  Alexander testified that Adams had a grand mal seizure.  Dr. Charles Railsback from the Texas Ear Nose and Throat Specialists Clinic testified that he is familiar with epileptic seizures.  He testified that he saw Adams at the clinic and that he was unconscious, stiff, making jerking motions, and had in fact, had a grand mal seizure.

Referred in July to Dr. Robert Leroy, a neurologist specializing in epilepsy, Adams described no prior seizures, but reported involuntary jerks in his arms and legs and episodes where he would “zone out.”  Dr. Leroy believed that these episodes were possibly partial seizures.

Adams submitted to around-the-clock video EEG long-term monitoring at a Dallas hospital for several days the following September.  During the monitoring, active steps were taken to allow a seizure to occur; sleep deprivation on the third day caused Adams to seize.

a. Dr. Leroy’s Assessments

Dr. Leroy testified that he performed a complete evaluation of Adams after he was referred to him following his seizure at the ENT Clinic.  He did various testing and determined that Adams had a seizure disorder. 

The jury observed an audio-visual presentation of his GTC seizure, simultaneously showing his brain waves.  Thus, Adams presented evidence regarding two witnessed seizures: one when seeking allergy relief and one at the Dallas hospital.  
Additional testimony disclosed a seizure over the Thanksgiving holiday in 2004.  
Dr. Leroy opined that Adams was prone to having seizures and probably has primary generalized epilepsy.  The doctor concluded that Adams’s condition was highly suggestive of a genetic type of epilepsy, rather than one brought about by injury or stroke, and he diagnosed Adams with juvenile absence epilepsy syndrome.

Having considered the evidence from Adams’s criminal case, Dr. Leroy concluded that it is reasonably medically probable that Adams suffered an absence seizure at 2:30 in the morning on June 11, 2004, causing the crash that killed Officer Medlin.
(footnote: 5)  According to Dr. Leroy, such a seizure was consistent with the facts because absence seizures can precede a GTC episode, have an abrupt onset, no aura, be brief in duration, and involve a prompt recovery without a postictal indication.  When a person has an absence seizure, he would not be awakened by a loud noise.  If a person was sleeping and was in an accident, the loud noise would wake him up.  
Post-seizure recovery period characteristics rule out a GTC seizure on the night of the offense because those seizures result in a lengthy recovery period of up to hours of confusion, sleep, strong headaches, and impairment.  Each of Adams’s GTC seizures resulted in lengthy periods of unconsciousness: at first he was described as being “out of it” and, after the second induced seizure, his postictal phase included thirty minutes of unconsciousness.  Dr. Leroy agreed that it was very unlikely that Adams suffered a GTC seizure on the night of the offense; post-seizure conditions would prevent operation of a vehicle or a cell phone.  
He recognized that the incidence of absence seizures in males after the age of fourteen is uncommon, but that minor seizure activity can occur without someone recognizing it. 

Dr. Leroy’s diagnosis relied on the medical history Adams related to him.  Dr. Leroy candidly conceded the subjective nature of medical histories, that circumstances such as Adams’s could give rise to misinformation in a history, and that Adams’s various post-crash medical histories were replete with conflicts.  For example, two days after the crash, Adams told a physician that he had not experienced any loss of consciousness during the crash.  When later treated for the first GTC seizure, Adams told the ER physician that he had experienced a “loss of consciousness” episode that night.  In that June 29, 2004 history, Adams denied that drinking or sleepiness played any part in the crash; he also denied experiencing any seizures in the past.  
Adams testified that he only denied sleepiness when discussing the wreck later at the ER.  
A few weeks later, Adams told Dr. Leroy that he drank four shots on June 11 between 7:00 p.m. and midnight, then one more shot between midnight and 2:00 a.m., but had not felt sleepy or intoxicated.

Dr. Leroy also admitted that any seizure that purportedly led to the crash could have been itself induced by alcohol consumption.  Dr. Leroy viewed a video of Adams at the scene and saw no signs of intoxication.  He saw no signs of neurological or physiological impairment, which he would expect to see if Adams was intoxicated.  Other seizure-induction factors included stress, such as the emotional fallout from the crash, which could have induced the GTC seizure in the doctor’s office.  Also, an antidepressant, Lexapro, prescribed for Adams post-crash, carries a risk of seizure.  Another factor—alcohol withdrawal—can cause seizures, especially if drinking ceases abruptly as occurred with Adams’s post-crash experience.  Thus, experiencing the stress of facing criminal charges and prison for having killed an officer, existing sleep problems and sleep deprivation, taking Lexapro, and experiencing alcohol withdrawal—all combined—could have led to Adams’s first GTC seizure.

Dr. Leroy acknowledged the possibility of nonepileptic causes for the crash.  He admitted that it could have been caused by Adams’s falling asleep (he is a chronic insomniac) or his intoxication.  Dr. Leroy recognized the complexity of the association between alcohol usage and epilepsy.  Alcohol withdrawal can cause and induce seizures that are not epileptic.  Dr. Leroy concluded his testimony by agreeing that it would be tragic for someone who actually committed a crime to incorrectly rely on epilepsy as a defense to that crime.

b. Dr. Hernandez 

As a rebuttal witness the State called Dr. Angel Hernandez, a neurologist who directs several Cook Children’s Medical Center programs.  Dr. Hernandez reviewed most of Adams’s medical records and some of the offense records. Relying on objective information only, this doctor believed that Adams suffers from GTC seizures such as the one purposefully induced in the Dallas hospital.

However, Dr. Hernandez discounted the conclusion that an absence seizure caused the crash because, although absence seizures are characterized by an arresting activity and are short in duration, they involve multiple daily occurrences.  Absence seizures are not isolated, happening once and then ceasing; they repeat.  Also, absence seizures are common in children and adolescents, but are rarely seen in patients more then twenty years’ old.  Dr. Hernandez saw no objective indication that Adams suffered from absence seizures in Adams’s medical records.

Dr. Hernandez’s review of Dr. Leroy’s records indicated that the records contradicted Dr. Leroy’s trial testimony.  The Trileptal medication that Dr. Leroy prescribed Adams exacerbated absence seizures; it is not prescribed when absence seizures are diagnosed because other medications are available.  Dr. Hernandez emphasized nothing in the defense expert’s records indicated that Dr. Leroy found that Adams suffered from absence seizures.  Dr. Hernandez opined that, contrary to Dr. Leroy’s testimony, Adams did not suffer an absence seizure on the night of the offense.

c. Adams’s Testimony

Adams began his testimony by telling the jury that he did not cause Officer Medlin’s death by reason of any type of intoxication or falling asleep. The day’s chronology included waking at 6:45 a.m., going to work at 8:00, leaving work at 5:00 for a car wash, eating at McDonald’s, browsing through Sam’s Club, enjoying the Dallas Gentleman’s Club, snacking at a Race Trac gas station, dancing at Carson’s, and driving home.

Food included a light breakfast at the office and snack food.  He ate a McDonald’s burger, fries, and salad.  While he did not eat at either club, Adams picked up a honey bun while at Race Trac early in the morning.

Drink-wise, Adams testified to drinking four shots of Crown Royal beginning at 7:30 p.m. and a couple of five-dollar bottles of water.  At the second club, Adams said he only had a few sips of whiskey.

Adams spent quite a bit of money that night.  To counter the suggestion that it all went to alcohol, Adams described paying for lap dances and drinks and tips for dancers, too.  Also, a car wash cost twenty dollars.

Leaving the second club at closing time, Adams stated that he would not have driven if he had been intoxicated.  Driving home on Highway 121, Adams planned to use the Cheek-Sparger exit.  Adams averred that this exit sign was his last observation until he saw his passenger-side air bag deployed, his broken windshield, and his car sliding to a stop down the exit ramp.  Adams claimed that at the time of the crash he was not feeling any effects from alcohol, nor was he sleepy.  Adams admitted that his body was fatigued from dancing. When his car stopped, he got out and saw headlights behind him.  After looking at his car, he called 911, then called his mother.

Regarding his subsequent contact with the officers, Adams disputed that he had stepped out in front of a passing car and also said he never claimed that he had a lot to drink that night.  While agreeing that he was not mistreated by officers that night, Adams suggested that he refused field sobriety testing because he feared the officers would just say that a young, black male had failed them.  Although he acknowledged the recorded statements about dozing off, Adams chalked these assertions up to his trying to rationalize what had occurred.  Finally, Adams contended that he refused the blood test out of fright.  Regardless of any other excuses conveyed, Adams admitted that he accidentally caused Officer Medlin’s death, without any fault attributed to Officer Medlin.

d. Adams’s Friends’ Testimony

To bolster the epilepsy diagnosis, Adams called three friends and an acquaintance to testify on his behalf.  Only the acquaintance saw Adams, albeit briefly, on the night of the offense.

Christopher Gregg, a friend of Adams’s from college, testified that in the past he had seen Adams freeze up and drop the phone he was using, shake a little bit and seem to space out, and become incoherent.  He recalled a 2001 incident where, after a night of drinking, Adams “froze up” and then shook ten seconds the next morning.  He saw this happen more than once.

Eric Prince, another friend of Adams, testified that he had spoken to Adams on June 11, 2004.  He also testified he had seen Adams consume alcohol but never saw him get out of control or close to it.

Jason Ware, a detention officer for the Tarrant County Sheriff’s Department, testified that he was friends with Adams.  He recalled that in high school and junior high school Adams would sometimes start a sentence and just lose his thought.

Drinking history was the primary topic.  None of the longtime friends had ever seen Adams intoxicated.  Adams’s general preference for Hennessy Cognac and Crown Royal on the rocks was discussed.
(footnote: 6)  Dallas Gentleman’s Club drinks cost between seven and nine dollars after paying a five-dollar cover charge.  Due to the cost, only two or three were typically ordered, along with bottles of water.  However, the friends did not mind spending money on tipping the dancers and obtaining twenty-dollar lap dances.

Adams visited a second north Dallas club on the morning of the incident called Carson’s Live Club.  While there, he ran into a college acquaintance, Anthony Phillips, who saw Adams dancing and visited with him.  This was around 10 to 12 at night.  Phillips last saw Adams around 1:00 a.m., and Adams did not look intoxicated, but Phillips admitted he knew nothing of what Adams drank or ate that night, nor did he know Adams’s alcohol tolerance.

D.
 
Sufficiency Holdings 

The evidence at trial was conflicting as to whether Adams was intoxicated and as to what caused the crash.  Although there is evidence that Adams could have had an absence seizure and that Officer Medlin may have been standing in an unsafe location, there is also legally and factually sufficient evidence that Adams was intoxicated to the extent that his ability to drive was affected.  Thus, there is legally and factually sufficient evidence that Adams was intoxicated and that his intoxication caused the crash.  Moreover, Adams’s evidence to the contrary is not so strong, nor does it outweigh the State’s legally sufficient evidence that the jury’s verdict is clearly wrong or manifestly unjust.   

Therefore, we hold that under the applicable standards of review, the evidence to be both legally and factually sufficient to support the judgment.  Adams’s first two issues are overruled.    

IV.  Suppression of the Blood Alcohol Test

In his third issue, Adams asserts that the trial court erred by failing to suppress the blood alcohol test administered to him.  We disagree.

A.  Standard of Review

The appropriate standard for reviewing most trial court’s rulings on a motion to suppress is a bifurcated standard of review, giving almost total deference to the trial court’s determination of historical facts and reviewing de novo the court’s application of the law.  
Maxwell v. State
, 73 S.W.3d 278, 281 (Tex. Crim. App.), 
cert. denied
, 537 U.S. 1051(2002); 
Carmouche v. State
, 10 S.W.3d 323, 327–28 (Tex. Crim. App. 2000); 
State v. Ross
, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000); 
Guzman v. State
, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

B.  Application

In
 Badgett v. State
, 42 S.W.3d 136 (Tex. Crim. App. 2001), the court of criminal appeals addressed the requirements for invoking the mandatory blood specimen provisions of Texas Transportation Code section 724.012(b).  Section 724.012(b) states as follows:

A peace officer shall require the taking of a specimen of the person’s breath or blood if:

(1) the officer arrests the person for an offense under Chapter 49, Penal Code, involving the operation of a motor vehicle or a watercraft;

(2) the person was the operator of a motor vehicle or a watercraft involved in an accident that the officer reasonably believes occurred as a result of the offense;

(3) at the time of the arrest the officer reasonably believes that a person has died or will die as a direct result of the accident:

(A) any individual has died or will die; or 

(B) an individual other than the person has suffered serious bodily injury; and 

(4) the person refuses the officer’s request to submit to the taking of a specimen voluntarily.

Tex. Transp. Code Ann.
 § 724.012(b) (Vernon Supp. 2006).

Section 724.013 provides that “[e]xcept as provided by Section 724.012(b), a specimen may not be taken if a person refuses to submit to the taking of a specimen designated by a peace officer.”  
Id.
 § 724.013.    

Badgett
 emphasized that the officer must reasonably believe that the accident occurred as a result of the offense, meaning the intoxication.  
See Badgett
, 42 S.W.3d at 139.
  The court said the following:

the plain language of the statute indicates that the officer’s “reasonable belief” that the accident occurred as the result of the offense must be based on something more than the mere fact of the accident and the officer’s arrest of the defendant for an intoxicated offense.  Therefore, we hold that such a belief must be based upon specific and articulable facts of causation.

Id.

As articulated by Adams, his argument in this regard is that “in the case at bar there is no specific and articulable causation” and that the observation of red watery eyes and the smell of alcohol was insufficient to meet the “articulable-facts-of-causation” tests.  We disagree with this analysis.

First, it is undisputed that Sergeant Williamson observed that a fellow officer had died as a direct result of the accident, that Adams had refused to submit to the taking of a blood sample voluntarily, and that Adams had been arrested pursuant to section 49.04 of the Texas Penal Code.  Sergeant  Williamson was told by Officer Ramsour that she believed that Adams might be intoxicated but that she had not conducted any tests at the time she made the statement.  Officer Ramsour conveyed details to Sergeant Williamson concerning Adams admissions about drinking and that she had confirmed an alcoholic smell on Adams.  Adams also admitted to Sergeant Williamson that he had been drinking earlier.  Sergeant Williamson also smelled alcohol on Adams’s breath and observed his watery and bloodshot eyes.  Williams suspected Adams was intoxicated because of his demeanor, the smell of alcohol on him, the appearance of his eyes, his admission to drinking earlier, and his refusal to submit to field sobriety tests.  Based on his experience and training, Sergeant Williamson believed that a person’s ability to drive, including his or her ability to stay on the roadway and avoid striking people and objects, is affected by alcohol.

Upon hearing all the evidence at the motion to suppress hearing surrounding the incident, the trial court ruled that Sergeant Williamson relied on the totality of circumstances at the scene to authorize a mandatory blood draw.  We agree and would further point out that in 
Badgett
, the arresting officer could only say that Badgett probably caused the accident because he was intoxicated.  
Badgett
, 42 S.W.3d at 139.  Here Sergeant Williamson provided specific and articulable facts supporting his reasonable belief that Adams’s intoxication caused the crash.  Adams’s third issue is overruled.

V.  Jury Instruction

Adams’s next issue asserts that the trial court erred in denying his request for a jury instruction under article 38.23 of the Texas Code of Criminal Procedure regarding the mandatory blood draw.

A.  The Requested Instruction

At the guilt innocence phase of the trial, Adams requested a charge under Texas Code of Criminal Procedure Article 38.23(b).  The requested charge was as follows, tracking the language of section 724.012(b) of the Texas Transportation Code:

You are instructed that our law provides that a police officer may only require a mandatory taking of a specimen of the person’s blood if the following factors are met:

(1) the officer arrests the person for an offense under Chapter 49, Penal Code, involving the operation of a motor vehicle or a watercraft;

(2) the person was the operator of a motor vehicle or a watercraft involved in an accident that the officer reasonably believes occurred as a result of the offense;

(3) at the time of the arrest the officer reasonably believes that a person has died or will die as a direct result of the accident; and 

(4) the person refuses the officer’s request to submit to the taking of a specimen voluntarily.

Therefore, if you believe from evidence beyond a reasonable doubt that the Euless Police Officer

(1) arrested Roy Adams, Jr. for an offense under Chapter 49, Penal Code, involving the operation of a motor vehicle or a watercraft;

(2) Roy Adams, Jr. was the operator of a motor vehicle or a watercraft involved in an accident that the officer reasonably believed occurred as a result of the offense;

(3) at the time of the arrest the officer reasonably believed that a person has died or will die as a direct result of the accident; and

(4) the person refuses the officer’s request to submit to the taking of a specimen voluntarily prior to the taking of the blood specimen 

then you may consider evidence, if any, obtained therefrom.

However, if you do not believe the above factors were met beyond a reasonable doubt, or if you have a reasonable doubt as to the truth of such facts, then you will wholly disregard any evidence obtained as a result of the blood specimen, and not consider such evidence for any purpose whatsoever.

The trial court refused to give the jury this charge.

Article 38.23 is the statutory basis for Adams’s requested charge to the jury.  That Article states,

No evidence obtained by an officer or other person in violation of any provision of the Constitution and laws of the State of Texas, or of the Constitution of laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case. 

In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained by violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

Tex. Code Crim. Proc. Ann.
 art. 38.23 (Vernon 2005).  In 
Murphy v. State
, 640 S.W.2d 297 (Tex. Crim. App. 1982), while discussing Article 38.23, the court stated,

The terms of the statute are mandatory, and when an issue of fact is raised, a defendant has a statutory right to have the jury charged accordingly.  The only question is whether under the facts of a particular case an issue has been raised by the evidence so as to require a jury instruction.

Id. 
at 299
.  Further, in 
Reynolds v. State
, the court reversed a case for failure to instruct the jury under Article 38.23 as to probable cause. 
 
848 S.W.2d 148, 149 (Tex. Crim. App. 1993)
 

B.  Application

An examination of the evidence before the jury as compared to the statutory requirements of section 724.012 of the Texas Transportation Code, 
supra,
 is as follows:

(1) the officer did arrest Adams pursuant to Chapter 49 of the Texas Penal Code, to wit, driving while intoxicated,

(2) Adams was the operator of the vehicle involved in the accident, which accident the officer reasonably believed occurred as a result of the intoxication—the previous enumerated circumstances caused this belief and at the time there was no evidence before the officer to lead him to believe that Adams had a seizure,

(3) a fellow officer had been killed as a result of the accident, and 

(4) Adams refused the officer’s request to voluntarily submit to the taking of a specimen.

Adams argues that he raised two fact questions at trial, whether he was intoxicated and whether his intoxication caused the accident.  The State does not dispute that Adams hotly contested those issues at trial.  However, there was no evidence disputing Sergeant Williamson’s authority to arrest Adams or his reasonable belief that the accident occurred as a result of Adams’s intoxication.  
See 
Tex. Transp. Code Ann.
 § 724.012(b)(1), (2).  Moreover, both 
Officer Ramsour and Sergeant Williamson testified to the smell of alcohol on Adams and other factors reasonably indicating Adams was intoxicated.  

Adams was entitled to an article 38.23 instruction only if the trial evidence raised a factual issue concerning whether the evidence was 
obtained
 in violation of the federal constitution or the Texas Constitution or any of its laws.  
Bell v. State
, 938 S.W.2d 35, 48 (Tex. Crim. App. 1996), 
cert. denied
, 522 U.S. 827 (1997).  Furthermore, there must be a factual dispute as to 
how the evidence 
was 
obtained
.  
Balentine v. State
, 71 S.W.3d 763, 773 (Tex. Crim. App. 2002).  However, Adams does not contend there is any factual dispute as to 
how the evidence was obtained
.   Only when there is a fact issue regarding the 
manner 
in which the evidence was obtained does Article 38.23 require the court to submit an instruction to the jury.  
Angelo v. State
, 977 S.W.2d 169, 178 (Tex. App.—Austin 1998, pet. ref’d). 

Neither Adams’s claim that he was not intoxicated, nor his claim that his alleged intoxication did not cause the accident raised a factual dispute as to the manner in which the complained-of evidence was obtained.  Therefore, we hold that there was no fact question warranting the submission of the requested instruction, and we overrule Adams’s fourth issue.

VI.  Cross-Examination

In his fifth issue, Adams asserts the trial court erred by overruling his objection that the State’s cross-examination question was shifting the burden of proof.  The complained of cross-examination was as follows,

Q. So you had an opportunity on that videotape to show that you were fine, to do the field sobriety tests [?] 

Mr. Hoover: Your Honor, I’m going to object.  This is an improper shifting of the burden of proof.  Mr. Adams neither now or [sic] today has the duty to prove anything.  

The Court: Overruled.  

Q. (By Mr. Alpert) You had an opportunity to show in that videotape what your faculties were like and you refused, right?

A. Yes, sir.

A. Standard of Review

To preserve error, a party must continue to object each time the objectionable evidence is offered.  
Fuentes v. State
, 991 S.W.2d 267, 273 (Tex. Crim. App.), 
cert. denied
, 528 U.S. 1026 (1999);
 Ethington v. State
, 819 S.W.2d 854, 858–59 (Tex. Crim. App. 1991).  A trial court’s erroneous admission of evidence will not require reversal when other such evidence was received without objection, either before or after the complained-of ruling. 
Leday v. State
, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998); 
Johnson v. State
, 803 S.W.2d 272, 291 (Tex. Crim. App. 1990), 
cert. denied
, 501 U.S. 1259 (1991), 
overruled on other grounds by
 
Heitman v. State
, 815 S.W.2d 681, 690 (Tex. Crim. App. 1991).  A party must object each time inadmissible evidence is offered or obtain a running objection. 
 Valle v. State
, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003).  An error in the admission of evidence is cured where the same evidence comes in elsewhere without objection. 
 Id.

B. Application

First, Adams is correct that an attempt to shift the burden of proof violates due process under the United States and Texas Constitutions.  
See Francis v. Franklin
, 471 U.S. 307, 312–15, 105 S. Ct. 1965, 1970–71 (1985); 
Brown v. State
, 122 S.W.3d 794, 799 (Tex. Crim. App. 2003), 
cert. denied
, 541 U.S. 938 (2004).  However, because Adams failed to preserve any possible error, we need not determine whether the State’s questioning impermissibly shifted the burden of proof. 

In addition to the above recited portion of the record, there were multiple occasions, both before and after Adams’s sole objection, in which the State elicited testimony regarding Adams’s refusal to perform field sobriety tests. Moreover, the State repeated the same assertion during closing argument and Adams did not object.  Therefore, we hold that Adams’s repeated failure to object waived any complaint under this issue.  
 

We overrule Adams’s fifth issue.  

VII. Deadly Weapon Finding

In his sixth issue, Adams claims the trial court improperly made a deadly weapon finding.  Based upon clear prior precedent, we disagree.   

The indictment alleged that Adams used a “deadly weapon, to-wit a motor vehicle.”  In his brief, Adams admits that the finding on a motor vehicle as a deadly weapon in an intoxication manslaughter case has been upheld by the court of criminal appeals.  
See Tyra v. State
, 897 S.W.2d 796, 798 (Tex. Crim. App. 1995).  Adams also states that he recognizes we are bound by the court of criminal appeals precedent, but urges that we consider this issue.  However, we should not frivolously overrule well-established precedent.  
Paulson v. State
, 28 S.W.3d 570, 571 (Tex. Crim. App. 2000).

We therefore hold that the trial court did not err by making a deadly weapon finding.  We overrule Adams’s sixth issue.  

VIII. Retrograde Extrapolation Testimony

In his seventh issue, Adams complains that the trial court erred by overruling his objection to retrograde extrapolation
(footnote: 7) testimony.  We hold this complaint was not preserved.       

A. Standard of Review 

To preserve error, a party must continue to object each time the objectionable evidence is offered.  
Fuentes
, 991 S.W.2d at 273.  A party must object each time inadmissible evidence is offered or obtain a running objection. 
 Valle
, 109 S.W.3d at 509.  An error in the admission of evidence is cured where the same evidence comes in elsewhere without objection. 
 Id.

B. Application 

Dr. Angela Springfield testified that a 185 pound male’s BAC while driving would have been higher than Adams’s blood test results after the crash based on facts similar to Adams’s case.  Dr. Springfield was told to assume that the person stopped driving at 2:30 a.m., had his blood drawn at 3:30 a.m., had stopped drinking two to three hours before 2:30 a.m., and that the person’s blood test results revealed a 0.11 BAC.  Adams’s counsel stated, “I’m going to object unless the jury is instructed that this is a hypothetical question.” In its preceding question the State used the word “hypothetical,” not once, but twice.  Adams was overruled.  Later during Dr. Springfield’s testimony regarding the State’s hypothetical, Adams objected that the question called for speculation and was again overruled.  Dr. Springfield went on to testify that she determined that at 2:30 a.m. the person’s BAC would have been higher than the 0.11 level discovered at testing an hour later.

After hearing these same hypothetical facts from the State, Dr. Maurice Dennis testified that a person’s BAC would have been higher than 0.11.  Adams did not object.  The State only asked Dr. Dennis about the BAC of this hypothetical person and did not ask him regarding his opinion of Adams’s
 
BAC at 2:30 a.m.  However, Adams’s own counsel questioned Dr. Dennis regarding Adams’s BAC at 2:30 a.m.  Dr. Dennis testified that based on the pretrial information he was provided that Adams’s BAC was somewhere between 0.12 and 0.13 at 2:30 a.m. on the night of the incident.

Because the State twice offered the same hypothetical scenario during testimony and Adams objected in only one of those instances, we hold Adams failed to preserve any error.  
See Valle
, 109 S.W.3d at 509; 
Fuentes
, 991 S.W.2d at 273.
  However, even if the admission of this evidence was error, a question that we need not reach, it was cured because the same evidence came in through Dr. Dennis’s testimony without objection.  
Valle
, 109 S.W.3d at 509. 

We overrule Adams’s seventh issue. 

IX. Amended Motion
 
for New Trial

In his eighth issue, Adams argues that the trial court erred by not holding a hearing on his amended motion for a new trial and allowing it to be overruled by operation of law.

The trial court sentenced Adams on August 3, 2005.  Adams had thirty days from this date to file his motion for a new trial.  
Tex. R. App. P.
 21.4(a).  He timely filed this motion on August 30, 2005.  On September 21, 2005, Adams filed an amended motion for new trial.  Based on Texas Rule of Appellate Procedure 21.4(b), this amended motion was untimely filed.  The amended motion was filed outside of the allowable period set by the rules and as such failed to vest the court with jurisdiction over the issue.  
See
 
Mercier v. State
, 96 S.W.3d 560, 562 (Tex. App.—Fort Worth 2002, pet. struck).  Since the trial court was without jurisdiction to rule on the amended motion for new trial, there was no error in refusing to grant the motion.      

We overrule Adams’s eighth issue.

X. Laboratory Accreditation

In his ninth issue, Adams alleges a due process violation based on alleged nondisclosure of exculpatory evidence.  Specifically, Adams asserts that the State failed to disclose evidence that at
 
the time of the testing of Adams’s blood sample, the medical examiner’s toxicology laboratory did not meet certain standards established by ASCLD/LAB and the Texas Department of Public Safety.  

A. Standard of Review 

The Due Process Clause of the Fourteenth Amendment to the United States Constitution is violated when a prosecutor fails to disclose evidence favorable to the accused that creates a probability sufficient to undermine confidence in the outcome of the proceeding.  
Thomas v. State
, 841 S.W.2d 399, 404 (Tex. Crim. App. 1992).  In order to establish a due process violation under 
Brady v. Maryland
,
(footnote: 8) a defendant must show the following:  1) evidence was suppressed;  2) the suppressed evidence was favorable to the defense;  and 3) the suppressed evidence was material to either guilt or punishment.  
Id.
; 
Taylor v. State
, 93 S.W.3d 487, 498–99 (Tex. App.—Texarkana 2002, pet. ref’d).  

 The first element of 
Brady 
is present if the prosecution actively suppresses evidence or negligently fails to disclose it.  
Taylor
, 93 S.W.3d at 499.  However, the state is not required to facilitate the compilation of exculpatory material that could have been compiled by the defense.  
Id.
  Thus, without suppression, there is no 
Brady
 violation.  
Id.  
Likewise, there is no 
Brady
 violation if the defendant fails to show that he or she was denied access to the allegedly favorable material.  
Id.
 In addition, if the defense has the opportunity to cross-examine concerning the allegedly exculpatory material and there is no showing the defense would have pursued a different trial strategy if he or she had known this information sooner, no 
Brady
 violation is shown.  
Id.

B. Application 

The State admits that at the time Adams’s blood sample was tested, the toxicology laboratory was not accredited.  However, the evidence showed that such accreditation was not required when the testing was performed.

The laboratory’s problems were discussed pretrial.  Adams’s own attorney specifically inquired about the inspections involved in the accreditation process and when the laboratory was accredited.  Furthermore, there was trial testimony that the laboratory’s deficiencies had been exposed during the accreditation inspections and that the deficiencies ranged from minor to major. 

Thus, it is obvious that Adams was aware of the laboratory’s problems both before and after trial.  Moreover, nothing in the record indicates that Adams’s access to the laboratory inspection records was somehow limited, nor was Adams’s ability to cross-examine ME office personnel about the inspections curtailed.  

We hold that there was no suppression of evidence and overrule Adams’s ninth issue.

XI. Patrol Car Videotape

In his final issue, Adams contends that the trial court erred by overruling his objection that the repeated playing of the later enhanced videotape made by Officer Medlin’s patrol car violated Texas Rule of Evidence 403.  Adams claimed that the videotape would be cumulative, would inflame the jury, and would cause the jury to decide the case on an emotional basis.  After overruling his objection, the trial court granted Adams a running objection to the playing of the videotape.

The State called Grant Fredericks to testify.  Fredericks is a forensic video analyst who enhanced the video from Officer Medlin’s patrol car.  During Fredericks’s testimony, the State played the video first without any sound and then a second time with the image clarified.  Prior to the second playing, Adams objected pursuant to Texas Rule of Evidence 403.  The trial court overruled this objection.  The video was then a played a third time, this time in slow motion. During this playing, the video was stopped and started several times for the jury.  The video was then played in continuous loops ten times.
(footnote: 9)  Fredericks then played the tape zooming in and out of various scenes. 

A. Admissibility of the Enhanced Videotape 

1. Standard of Review 

Video recordings in general may be more helpful to a jury than still photographs.  
Gordon v. State
, 784 S.W.2d 410, 412 (Tex. Crim. App. 1990). While still photographs offer to the jury an isolated and fixed content, a video recording allows a more panoramic representation of the physical and forensic evidence.  
Id.
 This not to say that any such videotape is per se admissible; a decision must be made by the trial court after viewing the tape, whether the probative value of the video is substantial or slight, and in the latter case whether the proffer is made solely to unfairly prejudice or mislead the jury or confuse the issues in the case.  
See Id.
; 
Tex. R. Evid.
 403. 

Furthermore, we review a trial court’s rulings on the admission of evidence under an abuse of discretion standard and will not reverse absent a clear abuse of discretion.  
Apolinar v. State
, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005).  
If the trial court’s decision to admit the evidence lies within the zone of reasonable disagreement, then the decision must be upheld. 
 Rankin v. State
, 974 S.W.2d 707, 718 (Tex. Crim. App. 1998) (op. on reh’g)
; Montgomery v. State
, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh’g)
.

2. Application 

We begin by noting that this is one of those rare instances where the actual crime itself is caught on videotape.  Counsel has pointed us to no authority, nor have we uncovered any, that establishes a heightened standard of review for the admission of an enhanced videotape as opposed to an ordinary videotape.  Thus, we review the trial court’s admission of the enhanced videotape under the abuse of discretion standard.  

Our review of the videotape reveals that it is highly probative of the fact and manner of Officer Medlin’s death.  
See Gordon, 
784 S.W.2d at 412.  Thus, it is clearly relevant under rule of evidence 402.  
Tex. R. Evid.
 402.  Moreover, the court of criminal appeals has previously refused to fashion a special rule governing the admissibility of gruesome pictures merely because they are recorded on videotape instead of developing paper. 
 See Gordon, 
784 S.W.2d at 413.  

We conclude, after viewing the videotape in its entirety, that it has substantial probative value and could have aided the jury in better understanding testimony offered during the trial.  We further conclude the probative value of the tape is not substantially outweighed by any prejudicial effect the video may have had upon the minds of the jurors in the case.  We cannot say the trial court’s decision to admit the video lies outside the zone of reasonable disagreement, and therefore, we must uphold its decision. 
 See Rankin
, 974 S.W.2d at 718.  Accordingly, we hold that the trial court did not clearly abuse its discretion by admitting the videotape.  
See
 
Apolinar
, 155 S.W.3d at 186.  

B. Repeated Playing of the Enhanced Videotape 

Having concluded that the enhanced videotape was admissible evidence, we need now address whether its repeated playing for the jury rises to the level of unfair prejudice under rule 403 or was unnecessarily cumulative and warrants reversal.  In other words, even if the videotape was properly admissible, was it error to allow it to be replayed repeatedly?  

The court of criminal appeals has held that a rule 403 analysis may include considerations of:  (1) the probative value of the evidence; (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent’s need for the evidence.  
See Reese v. State
, 33 S.W.3d 238, 240–41 (Tex. Crim. App. 2000).  For us to overrule the trial court’s Rule 403 analysis, we would have to say that the evidence lay outside the “zone of reasonable disagreement.”  
Robbins v. State
, 88 S.W.3d 256, 260 (Tex. Crim. App. 2002).

Assuming that it was error to allow the repeated playing of the videotape, a question we do not decide, we hold that it was harmless error.

1. Harmless Error 

Assuming error, we must conduct a harm analysis to determine whether the error calls for reversal of the judgment.  
Tex. R. App. P.
 44.2.  If the error is constitutional, we apply rule 44.2(a) and reverse unless we determine beyond a reasonable doubt that the error did not contribute to appellant’s conviction or punishment.  
Tex. R. App. P.
 44.2(a).  Otherwise, we apply rule 44.2(b) and disregard the error if it did not affect appellant’s substantial rights.  
Tex. R. App. P.
 44.2(b); 
see Mosley v. State,
 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh’g), 
cert. denied
, 526 U.S. 1070 (1999); 
Coggeshall v. State
, 961 S.W.2d 639, 642–43 (Tex. App.—Fort Worth 1998, pet. ref’d).

With respect to the erroneous admission of evidence, constitutional error is presented only if the correct ruling was constitutionally required, because a mere misapplication of the rules of evidence is not constitutional error.
  See  Alford v. State
, 22 S.W.3d 669, 673 (Tex. App.–Fort Worth 2000, pet. ref’d).  Here, Adams complains of the trial court’s admission of the repeated playing of the videotape.  Adams does not assert any constitutional implications nor do we discern any from his arguments.  Thus, the assumed error is not constitutional.  

Because we determine that the error is not constitutional, Rule 44.2(b) is applicable.  
Tex. R. App. P.
 44.2(b).  A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury’s verdict.  
King v. State
, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing 
Kotteakos v. United States
, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)); 
Coggeshall,
 961 S.W.2d at 643.  In making this determination, we review the record as a whole. 
 See Johnson v. State
, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

In his objections to the repeated playing of the video, Adams asserted that the State had already offered into evidence items of physical evidence, photographs, diagrams, and extensive testimony on the same issues on which the videotape was offered.  As discussed above, there was a great deal of evidence indicating that Adams was intoxicated and was driving the car that fatally struck Officer Medlin.  The enhanced videotape was simply one piece of evidence among many and was no more incriminating than the other evidence presented at trial.  Furthermore, after Fredericks was questioned on direct and redirect examination the State again sought to have the videotape “loop” played for the jury.  Adams again objected and this time the court sustained his objection.  

Apart from the videotape, the remaining evidence was more than sufficient to sustain Adams’s conviction.  Thus, we cannot say that the repeated playing of the tape 
had a substantial and injurious effect or influence in determining the jury’s verdict.  
King
, 953 S.W.2d at 271.  
We conclude that, in the context of the entire case against Adams, the trial court’s assumed error in allowing the repeated playing of the enhanced videotape did not have a substantial or injurious effect on the jury’s verdict and did not affect Adams’s substantial rights.  
See id. 
 Thus, we disregard the error.  
See
 
Tex. R. App. P.
 44.2(b).

We overrule Adams’s tenth issue.           

XII. Conclusion

Having overruled each of Adams’s ten issues, we affirm the trial court’s judgment.   

BOB MCCOY

JUSTICE

PANEL B: LIVINGSTON, GARDNER, and MCCOY, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED: February 15, 2007

 

    

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
Detective Peterson is an accident reconstructionist; he helped launch a collaborative accident reconstruction team among several mid-cities agencies.  The group is known as the C.R.A.S.H. team.

3:
When Adams testified, he claimed that he did not steer his car straight down the exit ramp and, later, that he could not steer because of the bent wheel.

4:
ASCLD/LAB is a accrediting body for crime laboratories.  Through accreditation a laboratory can demonstrate that its management, personnel, operational and technical procedures, equipment and physical facilities meet established standards.  
See 
ASCLD-LAB.org, About ASCLD/LAB, http://www.ascld-lab.org/dual/aslabdualaboutascldlab.html (last visited Feb. 6, 2007).    

5:
The evidence also included a brief discussion of potential photosensitivity and the strobe-like effect that windshield wipers and lights might precipitate. While only one percent of the population has epliespy, photosensitivity is even more uncommon and only occurs in three to five percent of those who have epilepsy.  Dr. Leroy believed it unlikely that Officer Medlin’s emergency lights induced a seizure, and Adams’s two photic stimulation tests had negative results.

6:
Adams’s key chain found at the crash sported an “S.S. Hennessy” logo.

7:
Retrograde extrapolation is the computation back in time of a person’s blood-alcohol level.  
Mata v. State
, 46 S.W.3d 902, 908–09 (Tex. Crim. App. 2001).  In a DWI case, it is used to determine the blood-alcohol level at the time of driving based on test results obtained at a later time.  
Id.

 

8: 373 U.S. 83, 83 S. Ct. 1194 (1963)
.  

9:
Adams asked the trial court to have the record reflect that the video was a continuous loop played ten times.  The trial court ordered that the record would so reflect.